UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CARLOS EMILIO HUERTA TERRAZA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:26-cv-00655-SRC |
| | ) | |
| SUSANA YOSIRA JUAREZ ZARATE, | ) | |
| | ) | |
| Respondent. | ) | |

**<u>Memorandum and Order</u>**

Recognizing the harm of international child abduction, numerous countries signed the Hague Convention on International Child Abduction, agreeing to order the return, subject to various exceptions, of children wrongfully abducted to their country.  Congress then passed the International Child Abduction Remedies Act (ICARA) to enforce the Hague Convention's protections.

In violation of the Hague Convention, Susana Yosira Juarez Zarate abducted her child from Mexico to the United States, in violation of her ex-husband's rights.  Her ex-husband, Carlos Emilio Huerta Terraza, filed in this Court a Verified Petition for the Return of the Child to Mexico under the Hague Convention on International Child Abduction.  Ms. Juarez asserted that the child was mature enough for the Court to consider the child's views, and that the child objected to returning to Mexico.  Ms. Juarez also claimed that the child would face a grave risk of harm from return.  The Court then held an evidentiary hearing and, after hearing all evidence, ordered the child's return to Mexico.  This Memorandum and Order detailing the Court's findings from the evidentiary hearing now follows.

## I.     Background

### A.     Factual background

The Court finds the following facts based on the evidence adduced at the evidentiary hearing.  Mr. Huerta and Ms. Juarez are Mexican citizens; they have one child together, born a Mexican citizen in Corregidora, Querétaro, Mexico, who was at the time of the hearing 10 years old.  Ex. 1 at 2; doc. 84, Evid. Hr'g Tr. at 61:25–62:9.  To protect the privacy of the couple's minor child, the Court refers to her only as "the child" and the like.

After Mr. Huerta and Ms. Juarez's marriage broke down, they divorced and signed a Parenting Agreement, ordered by the Querétaro family court, which provides them shared legal and physical custody over their child.  Doc. 84, Evid. Hr'g Tr. at 69:10–72:13; *see generally* Ex. 5.  Under the Parenting Agreement, Mr. Huerta has visitation rights, financial obligations, and shared rights to determine educational, medical, and other decisions for the child.  *See* Ex. 5 at 3–8; doc. 84, Evid. Hr'g Tr. at 72:14–79:3.  The Parenting Agreement also prohibits travel with the child outside Corregidora without a shared itinerary and court authorization, specifically noting the problem of illegal retention and child abduction.  *See* doc. 84, Evid. Hr'g Tr. at 79:4–79:14.

Mr. Huerta then suffered a car accident, causing brain injury.  *See* doc. 84, Evid. Hr'g Tr. at 74:8–74:23.  Ms. Juarez asked the family court to conduct a mental evaluation of Mr. Huerta and strip him of his custody rights; the family court then set a hearing to determine the best structure for Mr. Huerta to exercise his physical custody rights.  *Id.* at 79:15–80:10.  On June 10, 2025, the family court set a hearing for August 14, 2025—which Mr. Huerta successfully petitioned to move up to August 6, 2025—and gave Ms. Juarez temporary physical custody of the child pending this hearing.  *See* Ex. 14; Ex. G; doc. 84, Evid. Hr'g Tr. at 81:9–82:14.  On

2

June 19, 2025, with sole physical custody over the child, Ms. Juarez removed the child from Mexico and brought her to the United States. *See* Ex. 16; doc. 84, Evid. Hr'g Tr. at 49:23–50:3 (showing Ms. Juarez's admitting to leaving Mexico on June 19, 2025), 87:13–88:1. Ms. Juarez only told the child they were going to the United States for a vacation, yet they remained for almost a year. Doc. 85, In Camera Interview Tr. at 10:22–11:7, 15:12–16:12.

Having remained in the United States, Ms. Juarez did not attend the August 6, 2025 Hearing in Querétaro, or any other hearings after that. *See* doc. 84, Evid. Hr'g Tr. at 82:17–82:18; doc. 87, Evid. Hr'g Tr. at 20:1–21:6. Mr. Huerta found out from a Customs and Border Protection Form I-94 that Ms. Juarez and the child went to the United States on a visitor visa. Ex. 16; doc. 84, Evid. Hr'g Tr. at 87:13–88:1. On April 30, 2026, Mr. Huerta filed his verified petition seeking the return of the child to Mexico. Doc. 12; *see also* docs. 1–2.

### B.     Procedural history

Along with filing a verified petition, doc. 12, Mr. Huerta filed various motions, *see* docs. 2, 2-5, 16, including a motion for a temporary restraining order enjoining Ms. Juarez from removing the child from the Eastern District of Missouri, doc. 9. The Court ruled on Mr. Huerta's motions, docs. 8, 10, and entered the requested TRO and ordered Mr. Huerta to issue process on Ms. Juarez, doc. 11. The Court also ordered Ms. Juarez to file her responsive pleading no later than five days after service, set a status conference for June 5, 2026, and proposed June 8, 2026 as the date for the evidentiary hearing on the merits of Mr. Huerta's petition. *Id.* at 9 (The Court cites to page numbers as assigned by CM/ECF.); *see also* doc. 24 at 1 (setting the evidentiary hearing for June 8, 2026).

Ms. Juarez did not file her responsive pleading, but she did attend the June 5 Status Conference in person. *See* doc. 27. At the status conference, Ms. Juarez appeared pro se, and

3

orally moved to continue the evidentiary hearing, which the Court granted to June 10, 2025, so that Ms. Juarez could attempt to obtain counsel.  *See id.*

On June 10 and 11, 2026, the Court held the evidentiary hearing.  Docs. 67, 71.  After hearing all testimony and evidence from both parties, the Court granted Mr. Huerta's petition, made its findings on the record, and ordered the return of the child to Mexico.  *See* docs. 71–73. Ms. Juarez then, both orally and via written motion, doc. 74, moved for a stay of the Court's Judgment pending appeal, and the Court denied both motions, *see* docs. 71, 75.  Having orally made detailed findings and conclusions on the record, the Court further details its findings and conclusions here.

## II.    Standard

The Hague Convention on International Child Abduction aims "to protect children . . . from the harmful effects of their wrongful removal or retention."  *See* Hague Convention; *see also* 22 U.S.C. § 9001(a)(1) (Congress finding that "[t]he international abduction or wrongful retention of children is harmful to their well-being").  To remedy the problem of international child abduction, the "Convention seeks 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State' and 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'"  *Chafin v. Chafin*, 568 U.S. 165, 168 (2013) (citing Hague Convention art. 1).  Congress passed ICARA to effectuate the Hague Convention.  *See* 22 U.S.C. §§ 9001(b)(1) ("It is the purpose of this chapter to establish procedures for the implementation of the Convention in the United States."), 9003(d) ("The court in which an action is brought . . . shall decide the case in accordance with the Convention.").

4

Mexico, the country at issue here, *see* doc. 84, Evid. Hr'g Tr. at 54:3–54:8, is a Contracting State under the Hague Convention.  *See* U.S. Hague Convention Treaty Partners, U.S. Dep't State, https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited July 9, 2026) (listing Mexico as a treaty partner to the 1980 Hague Convention on the Civil Aspects of International Child Abduction).  "The Convention . . . empower[s] courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims."  22 U.S.C. § 9001(b)(4); *see also Barzilay v. Barzilay*, 600 F.3d 912, 917 (8th Cir. 2010) ("Proceedings under the Hague Convention and ICARA do not reach the merits of an underlying custody dispute." (citing Hague Convention art. 19)).

To establish the prima facie case for the return of a child under the Hague Convention, a petitioner must show (1) that the child habitually resided in a Contracting State to the Hague Convention, (2) that the petitioner had custody rights at the time of removal, which he (3) exercised, or would have exercised but for the wrongful removal.  *See Dubikovskyy v. Goun*, 54 F.4th 1042, 1047 (8th Cir. 2022); *Abbott v. Abbott*, 560 U.S. 1, 13 (2010) (citing Hague Convention art. 3(b)).

On element two, the Hague Convention provides that "'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  Hague Convention art. 5.  And such rights "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State."  Hague Convention art. 3.  Ms. Juarez challenged elements two and three.  *See* doc. 40-1 at 2; doc. 44 at 2.  "If a petitioner establishes

5

[a] prima facie case, the child must be promptly returned unless one of the narrow exceptions set forth in the Convention applies." *Dubikovskyy*, 54 F.4th at 1047 (cleaned up).

To prevail, petitioners must establish their prima facie case by a preponderance of the evidence. *See id.*; *see also Rodriguez v. Noriega*, 732 F. Supp. 3d 990, 1000 (D. Minn. 2024) (The preponderance of the evidence "is the evidence which, when weighed with that opposed to it, has more convincing force and is more probably true and accurate." (quoting *Smith v. United States*, 726 F.2d 428, 430 (8th Cir. 1984))). Respondents seeking to establish the mature-child defense also have to do so by a preponderance of the evidence. *See* 22 U.S.C. § 9003(e)(2)(B); *Dubikovskyy*, 54 F.4th at 1048. But those seeking to establish the grave-risk-of-harm defense must establish it by clear and convincing evidence, *see* 22 U.S.C. § 9003(e)(2)(A); *Silverman v. Silverman*, 338 F.3d 886, 900 (8th Cir. 2003); *see also Rodriguez v. Molina*, 96 F.4th 1079, 1083 (8th Cir. 2024) (explaining that the clear and convincing standard requires a Hague Convention petitioner to "show that a grave risk is 'highly probable'" (citing *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984))).

### III.    Discussion

At the close of the evidentiary hearing, *see* docs. 67, 71, the Court found that Ms. Juarez wrongfully removed the child from Mexico to the United States under the Hague Convention. *See* doc. 87, Evid. Hr'g Tr. at 23:8–27:9. The Court also found that Ms. Juarez failed to meet her burden to establish either defense she asserted. *See id.* at 27:10–32:5. The Court further discusses its findings and conclusions below.

6

### A.   Mr. Huerta's case in chief

The Court found that Mr. Huerta met his prima facie case.  *See* doc. 87, Evid. Hr'g Tr. at 23:8–27:9; *see also Dubikovskyy*, 54 F.4th at 1047; *Abbott*, 560 U.S. at 13 (citing Hague Convention art. 3(b)).

At the evidentiary hearing, Mr. Huerta and Ms. Juarez both agreed that the child habitually resided in Mexico before Ms. Juarez's removal of the child on June 19, 2025, doc. 84, Evid. Hr'g Tr. at 44:2–44:11, 54:3–54:8, and Mexico is—as discussed—a Contracting State to the Hague Convention, *see supra* Section II (discussing Mexico as a treaty partner to the 1980 Hague Convention on the Civil Aspects of International Child Abduction).

By its terms, the Parenting Agreement provides that Mr. Huerta and Ms. Juarez share legal and physical custody over their child.  *See* doc. 84, Evid. Hr'g Tr. at 71:13–72:13; *see generally* Ex. 5.  Mr. Huerta had visitation rights, financial obligations, and shared rights to determine educational, medical, and other decisions for the child.  *See* Ex. 5 at 3–8; doc. 84, Evid. Hr'g Tr. at 72:14–79:3.

But Ms. Juarez disputed that on June 19, 2025 Mr. Huerta had custody rights and that he was exercising those rights.  Doc. 84, Evid. Hr'g Tr. at 49:23–50:16.  Ms. Juarez's primary argument turns on a June 10, 2025 Order issued by the Querétaro family court.  Doc. 84, Evid. Hr'g Tr. at 54:9–54:20; *see also* Exs. 14, G.  Ms. Juarez agreed that Mr. Huerta had rights before this order, but not after.  Doc. 84, Evid. Hr'g Tr. at 54:9–55:6.

The Court instead found on the record that Mr. Huerta possessed, "by at least a preponderance of the evidence, . . . custody rights as of both June 10 and June 19 of 2025."  Doc. 87, Evid. Hr'g Tr. at 26:12–26:15.  First, the Parenting Agreement prohibits travel outside Corregidora without a shared itinerary and court authorization, specifically noting the problem of

7

illegal retention and child abduction. *See* Ex. 5 at 6; doc. 84, Evid. Hr'g Tr. at 79:4–79:14. Mr. Huerta's right to jointly decide the child's place of habitual residence—i.e., his right to have the child remain in Mexico—is sufficient for the Court to find that he had custody rights over the child. *See Abbott*, 560 U.S. at 15–16 (describing a parent's "right to decide his child's country of residence," or a "*ne exeat* right," as a right of custody under the Hague Convention). And Ms. Juarez's own witness—her Mexican attorney Jonathan R. Bocanegra Martinez—confirmed "that [the] provision prohibiting travel outside of Mexico . . . is in effect today," "in effect on June 10[] of 2025, June 19 of 2025, and every day between June 10 of 2025 and today[, June 11, 2026]." *See* doc. 84, Evid. Hr'g Tr. at 200:17–201:4.

Second, attorney Bocanegra also testified on cross-examination that the June 10, 2025 Order only temporarily suspended Mr. Huerta's visitation rights over the child; the order did not suspend his joint legal custody rights. *See* doc. 84, Evid. Hr'g Tr. at 194:4–194:23. Attorney Bocanegra confirmed that the Parenting Agreement's other provisions retained legal effect at the time of removal. *See id.* at 195:18–196:9. He further emphasized that Mr. Huerta *never* lost, and in fact retains—even on the date of the evidentiary hearing—legal custody rights over the child. *See id.* at 201:19–202:14. So, the Court found that Mr. Huerta had custody rights for the purposes of the Hague Convention. *See* Hague Convention art. 5.

The Court also found that Mr. Huerta was exercising these rights at the time of removal. doc. 87, Evid. Hr'g Tr. at 26:16–27:9. Mr. Huerta's testimony, which the Court found credible, established that Mr. Huerta exercised his visitation rights when possible and generally honored his financial obligations under the Parenting Agreement. *See* doc. 84, Evid. Hr'g Tr. at 76:4–76:20.

Even after the child's removal, Mr. Huerta bought school supplies for her, tried to find out where she was, attempted to call her on her birthday, and continued showing up to court hearings regarding her. *See* doc. 84, Evid. Hr'g Tr. at 76:18–77:7, 86:5–87:12. This is sufficient to show that Mr. Huerta was exercising his custody rights. *See Legal Analysis of the Hague Convention*, 51 Fed. Reg. 10494, 10507 (Mar. 26, 1986) ("Very little is required of the applicant in support of the allegation that custody rights have actually been or would have been exercised. The applicant need only provide some preliminary evidence that he or she actually exercised custody of the child, for instance, took physical care of the child."); *Abbott*, 560 U.S. at 15 (noting in the Hague Convention context that "the Executive Branch's interpretation of a treaty 'is entitled to great weight.'" (citation omitted)); *Rana v. Jenkins*, 113 F.4th 1058, 1066–67 (9th Cir. 2024) ("[B]ecause the logic underpinning *Chevron* deference is entirely distinct from the logic underpinning a deference to the Executive in matters of foreign affairs," *Loper Bright v. Raimondo*'s "reasoning does not touch, let alone undermine, the principle that we are to give deference to the Executive Branch's understanding of its own treaties." (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 393–94 (2024))); *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996) ("The only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.").

And because Mr. Huerta never consented to Ms. Juarez's removal of the child to the United States, doc. 84, Evid. Hr'g Tr. at 88:7–88:12, such removal violated his *ne exeat* rights under the Hague Convention, *see Abbott*, 560 U.S. at 20 ("[T]he Convention provides a return remedy for violations of *ne exeat* rights . . . .").

9

Ms. Juarez did elicit testimony from Mr. Huerta that made child-support payments into an unauthorized account that the child could not access.  Doc. 84, Evid. Hr'g Tr. at 109:7–110:10.  Mr. Huerta testified that he did so out of concern that Ms. Juarez would use the money personally, instead of using it for the child; Mr. Huerta also testified that he has not touched the money he deposited, and that the money would be available when the child needed it.  *Id.* at 135:11–135:25.  Attorney Bocanegra testified that such deposits are theoretically noncompliant.  *Id.* at 190:8–190:20.

While these apparently unauthorized deposits could call into question Mr. Huerta's exercising his custody rights, the Court for several reasons declines to stretch the issue that far.  First, finding an exercise of custody rights under the Hague Convention requires a low threshold of proof and Mr. Huerta's other actions, discussed above, more than meet this low threshold.  *See Legal Analysis of the Hague Convention*, 51 Fed. Reg. 10494, 10507 (Mar. 26, 1986); *Friedrich*, 78 F.3d at 1065d.  Second, any determination regarding Mr. Huerta's meeting his parental obligations would go to his compliance with the Parenting Agreement, implicating questions of Mexican family law and custody-related issues—matters the Court cannot determine.  *See* 22 U.S.C. § 9001(b)(4); *Barzilay*, 600 F.3d at 917 ("Proceedings under the Hague Convention and ICARA do not reach the merits of an underlying custody dispute." (citing Hague Convention art. 19)).  Third and finally, even if these apparently unauthorized deposits call into question Mr. Huerta's meeting his financial obligations, he exercised his other rights under the Parenting Agreement.

Ms. Juarez then elicited testimony from attorney Bocanegra attempting to differentiate between custody rights and "patria p[]otesta[s]" under Mexican law.  Doc. 84, Evid. Hr'g Tr. at 202:18–203:10.  But "patria potestas is considered a custodial right for purposes of the [Hague]

Convention." *Garcia v. Pinelo*, 808 F.3d 1158, 1167 (7th Cir. 2015). Further, if the Court were to narrow or expand what counts as custody rights under the Hague Convention based on Mexican law, the Court risks erroneously construing Mexican custody rights and invading the domain of the Mexican family courts. *See* 22 U.S.C. § 9001(b)(4); *Barzilay*, 600 F.3d at 917 ("Proceedings under the Hague Convention and ICARA do not reach the merits of an underlying custody dispute." (citing Hague Convention art. 19)). The Court declines Ms. Juarez's invitation to do so.

Based on the evidence, the Court found that Ms. Juarez wrongfully removed the child from Mexico, the place of the child's habitual residence, and that this removal violated Mr. Huerta's custody rights. *See* doc. 87, Evid. Hr'g Tr. at 23:8–27:9. And Mr. Huerta had, and actually exercised, his custody rights over the child under the Hague Convention. *See id.* To the extent that he did not exercise such rights, the Court found that he would have exercised them but for Ms. Juarez's wrongful removal of the child. *See id.* at 27:1–27:4 ("By abruptly and unilaterally removing [the child] to the United States, Ms. Juarez deprived Mr. Huerta of his ability to exercise his rights."); *see Abbott*, 560 U.S. at 13 (citing Hague Convention art. 3(b)). Therefore, the Court found, without hesitation, that Ms. Juarez's removal was wrongful under the Hague Convention. *See* Hague Convention art. 3(b); *Dubikovskyy*, 54 F.4th at 1047.

## B.    Ms. Juarez's defenses

Because Mr. Huerta made a prima facie case for the removal of the child, the Court next examined whether Ms. Juarez met her burden to establish any defense to bar the return of the child. *See Dubikovskyy*, 54 F.4th at 1047. Ms. Juarez presented the mature-child defense and the grave-risk-of-harm defense. *See* doc. 44 at 1–2. The Court found that she did not meet her burden to establish either defense. *See* doc. 87, Evid. Hr'g Tr. at 27:10–32:5.

11

### 1.    Mature-child defense

The mature-child defense allows courts to "refuse to order the return of the child if . . . the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [the child's] views." Hague Convention art. 13.  A respondent seeking to bar return based on this defense has the burden of establishing it by a preponderance of the evidence.  *See* 22 U.S.C. § 9003(e)(1); *Dubikovskyy*, 54 F.4th at 1048.

"The Convention does not set an age at which a child is automatically considered to be sufficiently mature, rather the determination is to be made on a case-by-case basis." *Babcock v. Babcock*, 503 F. Supp. 3d 862, 880 (S.D. Iowa 2020) (quoting *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007)).

Courts have found children sufficiently mature when their reasons for objecting to return reflect adult-like considerations.  *See, e.g.*, *Dubikovskyy v. Goun*, No. 2:20-cv-04207-NKL, 2021 WL 456634, at *5 (W.D. Mo. Jan. 7, 2021) (finding a child sufficiently mature when her "reasons given are ones that an adult might consider when deciding where to live, i.e. family responsibilities, comfort, and opportunities to pursue goals that are meaningful and inspiring to [her]."), *rev'd and remanded on other grounds*, 54 F.4th 1042 (8th Cir. 2022); *Garcia v. Pinelo*, 122 F. Supp. 3d 765, 783 (N.D. Ill.), *aff'd*, 808 F.3d 1158 (7th Cir. 2015) (finding a child "sufficiently mature to invoke the exception" when the child was "a bright, compassionate, and confident twelve-year old, who . . . demonstrated a keen understanding of the dispute between his parents . . . [and] answered questions thoughtfully and showed levels of empathy and diplomacy beyond those of an ordinary twelve-year-old").  But where a child had "interests and concerns of a perfectly normal child of his age," a court is unlikely to find the child sufficiently mature.  *Bhattacharjee v. Craig*, No. 4:21-cv-00826-SEP, 2021 WL 4504376, at *4–5 (E.D. Mo.

12

Oct. 1, 2021) (finding that a 13-year-old child was not sufficiently mature when asserting that his father was aggressive and restrictive because he imposed bedtimes and screen limitations and gave exaggerated and disproportionate responses to minor adversities); *see Preston v. Preston*, No. 4:22-cv-00990-CAN, 2023 WL 300130, at *4 (E.D. Tex. Jan. 17, 2023) (finding a child not sufficiently mature when her testimony reflected the "interests and concerns of a perfectly normal child of her age").

Further, "[t]he child's objections can be the sole reason that a court refuses to order return, but when they are, the 'court must apply a stricter standard in considering a child's wishes.'" *Custodio v. Samillan*, 842 F.3d 1084, 1089 (8th Cir. 2016) (quoting *Tsai–Yi Yang*, 499 F.3d at 278). "In making its determination, a court should also consider whether a child's desire to remain or return to a place is 'the product of undue influence,' in which case the 'child's wishes' should not be considered." *Tsai-Yi Yang*, 499 F.3d at 279; *see also Legal Analysis of the Hague Convention*, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986) ("A child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child."); *see also Abbott*, 560 U.S. at 15; *Rana*, 113 F.4th at 1066–67. And a court may order the return of the child despite the mature-child defense. *See Custodio*, 842 F.3d at 1091–92; *Legal Analysis of the Hague Convention*, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986) ("As with the other Article 13 exceptions to the return obligation, the application of this exception is not mandatory.").

Here, the Court conducted a lengthy in camera interview of the child. *See* doc. 67. As discussed on the record, the undersigned and the child "established a very positive rapport." Doc. 84, Evid. Hr'g Tr. at 206:1–206:3. The Court administered an oath to the child and confirmed that she understood it. *See id.* at 206:8–206:9. The Court then conducted "a very

13

fulsome interview." *Id.* at 206:15–206:16.  The child told the Court that when removing her from Mexico, Ms. Juarez told her that they were going to the United States for "a vacation." Doc. 87, Evid. Hr'g Tr. at 26:1–26:5.

It was evident to the Court that the child particularly fixated on the specific topics that Ms. Juarez presented at the evidentiary hearing.  Doc. 84, Evid. Hr'g Tr. at 208:7–208:14.  The Court also found that the child was not particularly fond of Mr. Huerta's disciplinary style, *see id.* at 208:23–209:11, and her description of his disciplinary measures included "typical pre-teen exaggeration," *id.* at 207:7–207:15.  And the Court found that the child's animosity towards Mr. Huerta's disciplinary styles was "fueled, at least in part, by Ms. Juarez's antagonistic attitude towards Mr. Huerta."  Doc. 87, Evid. Hr'g Tr. at 29:10–29:12; *see also Tsai-Yi Yang*, 499 F.3d at 279; *Legal Analysis of the Hague Convention*, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986) ("A child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child.").

After the interview, the Court concluded that the child's "answers revealed very age-appropriate thinking and very age-appropriate maturity."  Doc. 84, Evid. Hr'g Tr. at 205:22–205:25.  And the Court was also "mindful that [the child] has been deprived by her mother of any contact with her father for nearly one full year."  Doc. 87, Evid. Hr'g Tr. at 31:22–31:24.  Accordingly, the Court found that Ms. Juarez did not meet her burden under the mature-child defense.  *See id.* at 31:2–32:5; *see also* 22 U.S.C. § 9003(e)(1); *Dubikovskyy*, 54 F.4th at 1048.

Based on the entirety of the record, the Court further finds that the child's position on staying in the United States is not the product of a mature child.  To the contrary, the child's position is based on Ms. Juarez's undue influence.  The Court bases these findings on the entirety of the record, its evaluation of the evidence and credibility of witnesses, and the age-appropriate

14

(but by no means adult) maturity level of the child.  Regarding maturity, the Court finds the child to be a delightful ten-year old; the child, though, expressed no meaningful thoughts or preferences based on adult-like reasoning, considerations, or concerns.  The Court has no doubt that Ms. Juarez's deprivation of any contact between the child and her father for almost a year led the child to favor staying in the United States.

### 2.    Grave-risk-of-harm defense

Ms. Juarez next presented the grave-risk-of-harm defense.  *See* doc. 44 at 1–2.  This defense allows courts to refuse returning the child if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Hague Convention art. 13(b).  A respondent seeking to bar return based on this defense has the burden of establishing it by clear and convincing evidence.  *See* 22 U.S.C. § 9003(e)(2); *Silverman*, 338 F.3d at 900 ("The 'grave risk of physical or psychological harm' defense is an affirmative defense under Article 13(b) of the Convention that [a respondent] must prove with clear and convincing evidence.").

"There are two types of grave risk that are appropriate under Article 13(b): sending a child to a 'zone of war, famine, or disease,' or in cases of serious abuse or neglect." *Silverman v. Silverman*, 338 F.3d 886, 900 (8th Cir. 2003) (citing *Friedrich*, 78 F.3d at 1069); *see also Vasquez v. Colores*, 648 F.3d 648, 650 (8th Cir. 2011) ("We have recognized two types of grave risk that are cognizable under Article 13(b):  cases in which a child is sent to a zone of war, famine, or disease[,] and those involving serious abuse or neglect." (citing *Silverman*, 338 F.3d at 900)).

The "Article 13b inquiry does not include an adjudication of the underlying custody dispute, and only requires an assessment of whether the child will face immediate and substantial

risk of an intolerable situation if he is returned to [the country of habitual residence] pending final determination of his parents' custody dispute." *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995) (cleaned up).  And such a risk must be "grave, not merely serious." *Legal Analysis of the Hague Convention*, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986).

Such grave risk does not encompass the adjustment issues and psychological harm from relocating back to the country of habitual residence.  *See Friedrich*, 78 F.3d at 1067–68; *Blondin v. Dubois*, 238 F.3d 153, 164 (2d Cir. 2001), *abrogated on other grounds by Golan v. Saada*, 596 U.S. 666 (2022).  To hold otherwise would reward the abducting parent and incentivize her to conceal the abduction for as long as possible.  Further, past abuse against a child does not necessarily establish that a child will face abuse upon return.  *See Rodriguez*, 96 F.4th at 1084. And abuse against a spouse does not automatically establish a grave risk of harm to the child. *See Nunez-Escudero*, 58 F.3d at 377.  To therefore apply the grave-risk-of-harm exception, a court would need "to cite specific evidence of potential harm to the individual children." *Silverman*, 338 F.3d at 900 (citation omitted).

Even when a respondent meets her burden, a court retains the discretion to order the return of the child notwithstanding the defense.  *See Golan v. Saada*, 596 U.S. 666, 676 (2022) ("By providing that a court 'is not bound' to order return upon making a grave-risk finding, Article 13(b) lifts the Convention's return requirement, leaving a court with the discretion to grant or deny return.").

Here, Ms. Juarez asserted multiple grounds to invoke the grave-risk-of-harm defense. The Court addresses each of them in turn.

### a.    The October 2019 Protective Order

Ms. Juarez discussed a 2019 Protective Order in which the Querétaro family court ordered Mr. Huerta to stay at least 100 meters away from Ms. Juarez and the child.  *See* doc. 43-1 at 6, Ex. B.  But the Court finds that this order does not support a grave-risk finding.

First, on its face, the order does not contain any articulable factual finding regarding the events preceding its issuance.  *See id.*  Second, Mr. Huerta testified that this order was issued as a matter of protocol, and was not paired with a formal charge for any abuse of Ms. Juarez.  *See* doc. 84, Evid. Hr'g Tr. at 116:8–116:11, 137:13–137:24.  Ms. Juarez did not rebut such testimony.

Third, this order was issued almost six years ago—when the child was four—rendering minimal its probative value in determining whether the child faces an imminent grave risk of harm upon return to Mexico today.  *See id.* at 116:2–116:4, 137:13.  Fourth, in the Parenting Agreement, entered into February 2020, the parties agreed to "withdraw and remove any other investigative files that exist to date," Ex. 5 at 8, further undermining any grave-risk finding from this order.

Fifth and finally, the parties dispute the underlying facts giving rise to this order.  Mr. Huerta claims that Ms. Juarez accosted him, screaming and swearing at him and the child (who was sleeping), when Mr. Huerta took the child into the bedroom and closed the door.  Doc. 84, Evid. Hr'g Tr. at 69:18–69:24.  Ms. Juarez then apparently banged on the door and tried to open it; upon her opening the door, an altercation ensued, in which Ms. Juarez allegedly physically attacked Mr. Huerta.  *Id.* at 69:25–70:14.  Mr. Huerta pushed Ms. Juarez away, causing her to yell "help me," and leave the house.  *Id.* at 69:25–70:14.  Mr. Huerta claims that Ms. Juarez went

17

to a prosecutor and sought an order removing him from their apartment, making Mr. Huerta move to his mother's house.  *Id.* at 70:20–71:12.

Ms. Juarez contrarily asserts that she was concerned about Mr. Huerta's spending time alone with the child, because of his "strange behavior" (more on this later).  *Id.* at 153:2–153:11. So when Mr. Huerta was locked in a room with the child, Ms. Juarez claims she was trying to enter the room out of concern for the child's safety.  *Id.* at 153:4–153:6.  Apparently, this angered Mr. Huerta, who allegedly came out of the room, took Ms. Juarez's phone away, and began to choke her.  *See id.* at 153:7–153:9.

Because of the factual discrepancies—and the order's silence on its underlying facts, *see* doc. 43-1 at 6, Ex. B—the Court cannot determine that Mr. Huerta was the aggressor.  But even if he was, this would not establish that the child would face a grave risk of harm upon return to Mexico six years later.  *See Nunez-Escudero*, 58 F.3d at 377 (providing that abuse against a spouse does not automatically establish a grave risk of harm to the child).

In sum, the Court does not find that the 2019 Protective Order supports a grave-risk-of-harm finding.  *See* doc. 87, Evid. Hr'g Tr. at 27:14–28:6.

### b. The 2024 DIF Investigation

Ms. Juarez next brings up a 2024 investigation for violence by the Mexican child-welfare office (referred to by the parties as DIF), initiated after Ms. Juarez made a report to the office. *See* doc. 84, Evid. Hr'g Tr. at 154:20–156:17; doc. 43-1 at 9, Ex. C.  But the face of this document and Ms. Juarez's testimony surrounding it both suggest that this investigation began after Ms. Juarez's unilateral report, without any consideration of Mr. Huerta's perspective.  *See* doc. 84, Evid. Hr'g Tr. at 156:10–156:17; doc. 43-1 at 9, Ex. C.  And no testimony contradicted Mr. Huerta's lack of notice or opportunity to be heard.  And although the order mentions

"violence," the only incident the order discusses involves Mr. Huerta's kicking the child out of the house, but the order trails off before fully explaining the surrounding circumstances. *See* doc. 43-1 at 9, Ex. C.

Mr. Huerta testified that on two occasions when the child was throwing tantrums, he sent her outside the house for around five minutes as a punishment. *See* doc. 84, Evid. Hr'g Tr. at 138:4–139:18. He maintains that he "was able to watch her from inside the house." *Id.* at 138:21. He acknowledged that this perhaps "was not the best way," but that he "wanted her to think beyond just herself." *Id.* at 138:22–138:24. And after this, he would bring the child inside, sit her down, and explain why he had punished her. *See id.* at 139:14–139:18. He added that the child was "difficult at times because [Ms. Juarez] told her that she didn't have to listen to [him] and that she could tell the judge whatever she wanted as an accusation against [him]." *Id.* at 138:14–138:16.

While Ms. Juarez found such disciplinary techniques "not age appropriate," the Court cannot find that such techniques create a grave risk that the child "will face immediate and substantial risk of an intolerable situation if [s]he is returned to Mexico . . . ." *Nunez-Escudero*, 58 F.3d at 377.

### c.    The June 10, 2025 Order

Next, Ms. Juarez submitted to the Court the order from the Querétaro family court dated June 10, 2025 that temporarily suspended Mr. Huerta's visitation rights. *See* Ex. 14; Ex. G. The order mentions that Mr. Huerta accepted certain unnamed harms and omissions. *See* Ex. 14 at 1; Ex. G at 2. Attorney Bocanegra testified that for a Mexican court to suspend and set up supervised visits, it would have to find that a child was "at a likely risk of being in a situation

19

that could affect [her] emotional, physical, or sexual stability, with respect to her as a person." Doc. 84, Evid. Hr'g Tr. at 187:10–188:8.

The Court found this evidence dubious to support a grave-risk finding.  Doc. 87, Evid. Hr'g Tr. at 28:17–29:2.  First, the order does not establish what harms and omissions Mr. Huerta accepted, *see* Ex. 14 at 1; Ex. G at 2, making it untenable for the Court to determine that "specific evidence of potential harm to the" child exists, *Silverman*, 338 F.3d at 900.  Second, it is further unclear whether such harms or omissions would create a high probability of a grave risk of harm under the Hague Convention.  *See id.* ("There are two types of grave risk that are appropriate under Article 13(b): sending a child to a 'zone of war, famine, or disease,' or in cases of serious abuse or neglect."); *Nunez-Escudero*, 58 F.3d at 377 (The "Article 13b inquiry . . . only requires an assessment of whether the child will face immediate and substantial risk of an intolerable situation if [s]he is returned to [the country of habitual residence] pending final determination of his parents' custody dispute.").

Third, this order is not a final adjudication on the merits of Mr. Huerta's custody rights; on its face, it sets a later hearing for further adjudication.  *See* Ex. 14 at 3; Ex. G at 4.  And attorney Bocanegra testified that the relevant case remains open and additional matters remain pending.  *See* doc. 84, Evid. Hr'g Tr. at 188:19–190:4.  Fourth and finally, a Mexican federal court recently found that the Querétaro family court's June 10, 2025 Order violates the Mexican constitution, *see* Ex. 22 at 89–109; doc. 65-1 at 89-109, and attorney Bocanegra credibly testified that the Querétaro family court would have to follow the federal court's ruling, *see* doc. 84, Evid. Hr'g Tr. at 201:5–201:18.  This federal ruling further undermines this order's supporting a grave-risk finding.  *See Nunez-Escudero*, 58 F.3d at 377.

### d.    Parenting decisions

Next, Ms. Juarez presented various parenting decisions by Mr. Huerta as evidence of an alleged grave risk of harm. The first involves the child (appreciably younger than she is now) on Mr. Huerta's lap in the driver's seat of a car. *See* Ex. J. Ms. Juarez elicited testimony from Mr. Huerta that it was perhaps not right to let the child drive. Doc. 84, Evid. Hr'g Tr. at 113:2–113:5. But this video is scant evidence of a high probability of a grave risk of harm today. First, the parties dispute when it was taken; Ms. Juarez tried to assert November 2020, *id.* at 111:19–112:19, while Mr. Huerta claimed the video was taken in February or March of 2021, *id.* at 136:4–136:5. So at the very least, the video is more than five years old. Second, while Mr. Huerta claims that "it was not right [of him] to" have the child sit up front with him, he also said that he felt that the child was safe throughout the ride. *Id.* at 137:6–137:12. Mr. Huerta also testified that the car did not exceed 15 kilometers per hour while driving, and that the driving occurred within a closed subdivision. *Id.* at 136:21–136:24. The video also clearly shows Mr. Huerta's hand on the steering wheel while the child purports to drive the car. *See* Ex. J. All of these facts do not support a finding that "the child will face immediate and substantial risk of an intolerable situation if [s]he is returned to Mexico." *Nunez-Escudero*, 58 F.3d at 377.

Next, Ms. Juarez elicited testimony from Mr. Huerta that he flew a drone into the child during a trip to Guadalajara. Doc. 84, Evid. Hr'g Tr. at 119:11–120:11; *see also* Ex. I at 1–2. But his testimony on both cross and redirect examinations—which the Court found credible—establishes that Mr. Huerta accidentally flew a drone into the child when trying to avoid hitting other passersby. *See* doc. 84, Evid. Hr'g Tr. at 119:11–120:11, 140:9–140:25. He described the event as a "terrible mistake," and ensured that the child saw a dermatologist and plastic surgeon. *See id.* During the in camera interview, the child had difficulty identifying which eyebrow bore

the scar from this incident.  *See* doc. 85, In Camera Interview Tr. at 45:19–46:14.  All of these facts hardly support a finding that "the child will face immediate and substantial risk of an intolerable situation if [s]he is returned to Mexico."  *Nunez-Escudero*, 58 F.3d at 377.

Ms. Juarez next elicited testimony regarding some medical incidents.  During her cross-examination of Mr. Huerta, Mr. Huerta admitted that the child got sick during a trip to Puerto Vallarta, but received treatment.  *See* doc. 84, Evid. Hr'g Tr. at 131:13–132:12.  And Ms. Juarez tried to offer hearsay testimony suggesting that Mr. Huerta sought medical treatment later than he should have.  *See id.* at 158:1–159:11.  Ms. Juarez also testified that Mr. Huerta disagreed with her on various medical decisions regarding the child, involving therapy and other things.  *See id.* at 169:23–170:5.  But decisions regarding whether to obtain medical treatment for a child, what treatment to obtain, and when to obtain it are all parenting decisions.  And, Ms. Juarez failed to adduce any meaningful evidence supporting any harm to or endangerment of the child as a result of these incidents.  On these facts, Mr. Huerta's approach to such decisions cannot support a finding that "the child will face immediate and substantial risk of an intolerable situation if [s]he is returned to Mexico."  *Nunez-Escudero*, 58 F.3d at 377; *see also Silverman*, 338 F.3d at 900 (limiting the application of the grave-risk-of-harm defense to "sending a child to a 'zone of war, famine, or disease,' or . . . cases of serious abuse or neglect.").

The Court next considers allegations that Mr. Huerta struck the child.  Ms. Juarez claims that the child would "constantly come back" after visitations and "tell [Ms. Juarez] about what [the child] had experienced with her father.  Experiencing violence."  Doc. 84, Evid. Hr'g Tr. at 154:14–154:17.  But the only incident Ms. Juarez then discusses, referencing Exhibit C, is Mr. Huerta's kicking the child out of the house and apparently not allowing the child's communicating with Ms. Juarez.  *See id.* at 155:1–155:18; *see also* Ex. C at 1.  During Ms.

22

Juarez's cross examination of Mr. Huerta, she brought up some pictures of the child showing bruising on her legs; Ms. Juarez suggests that such bruising indicates fingerprints. *See* doc. 84, Evid. Hr'g Tr. at 118:16–119:10. But Mr. Huerta denied striking the child, suggesting instead that the bruising came from playing; he emphatically declared that he "ha[s] never mistreated [his] child" and "would never do it." *See id.* So the Court excluded from evidence the picture of the bruising due to its lack of foundation. *Id.* at 125:17–126:15. Even if the Court were to consider the picture, it would not support a finding of a grave risk of harm. *See Nunez-Escudero*, 58 F.3d at 377.

Ms. Juarez also attempted to rely on reports and testimony regarding the child by Psychologist Maria Soledad (Marisol) Zabalegui Rodriguez, who Ms. Juarez claimed served as the child's therapist. *See* Exs. D, E; doc. 84, Evid. Hr'g Tr. at 51:13–52:7; *see also id.* at 133:17–133:21. Mr. Huerta moved to exclude these reports and any expert testimony by Ms. Zabalegui under Federal Rules of Evidence 702 and 703. *See* doc. 52. The Court first noted that a Mexican federal court found that Ms. Zabalegui's report dated May 19, 2025, Ex. E, lacked full probative value under Mexican law, *see* doc. 84, Evid. Hr'g Tr. at 25:2–25:7; *see also* doc. 65-1 at 90–94, and granted the motion on the record for numerous reasons.

First, the Court found that Ms. Zabalegui "uncritically accepts the statements that" the child "ma[d]e[] to her without any determination of the veracity of those statements." Doc. 84, Evid. Hr'g Tr. at 26:6–26:8. Second, Ms. Ms. Zabalegui's methodology contained numerous flaws; she "did not interview, and the reports do not reflect that she interviewed Mr. Huerta or Mr. Huerta's mother, both of whom are [the] subject of many of the comments of [the child] in those statements in the reports," nor did Ms. Zabalegui "examine[] any documents that would be relevant to the factual assertions" the child made. *Id.* at 26:8–26:16. She also "did not use any

validated instruments, she did not use any peer-reviewed protocols, she had no forensic interview structure, [and] she engaged in no differential analysis." *Id.* at 27:14–27:17.  Third, Ms. Zabalegui "also reache[d] a number of legal conclusions that . . . she is unqualified to make" and used "legal terms like 'violence," without "recit[ing] any fact . . . that would indicate what, under American law [and] federal law[,] would constitute violence." *Id.* at 27:21–28:2.  Fourth, Ms. Zabalegui's testimony risks jeopardizing her existing therapist relationship with the child.  *Id.* at 28:11–29:8.  Finally, the Court noted that even if it were to consider Ms. Zabalegui's reports and testimony, it would accord them "very little, if any at all, weight" because of their "numerous fundamental flaws."  Doc. 84, Evid. Hr'g Tr. at 29:9–29:19.

The child's statements during the in camera interview further contradict Ms. Juarez's assertions of physical abuse.  The child stated that Mr. Huerta only hit her in one instance when she was eight-years old, on the buttocks, when she did not finish her homework.  *See* doc. 85, In Camera Interview Tr. at 60:1–61:24, 63:7–64:7.  The Court could not find that the instance amounted to a grave risk that the child's return will prompt "serious abuse or neglect." *Silverman*, 338 F.3d at 900.  And as the Court noted on the record, "even if the evidence were to show serious abuse in the past"—which "the evidence does not so show"—the Court "cannot find that it is highly probable that any alleged abuse would continue upon the child's return to Mexico."  Doc. 87, Evid. Hr'g Tr. at 29:25–30:5; *see also Rodriguez*, 96 F.4th at 1084 (finding that past abuse against a child does not necessarily establish that a child will face abuse upon return).  The record reveals starkly different parenting styles:  Mr. Huerta's being more strict and Ms. Juarez's being more permissive; while these may be the coin of the realm of acrimoniously divorced custodial parents, they do not support a finding of grave risk of harm.   On the record

24

before it, the Court does not find that "the child will face immediate and substantial risk of an intolerable situation if [s]he is returned to Mexico." *Nunez-Escudero*, 58 F.3d at 377.

### e.   Alleged abuse against Ms. Juarez and other miscellaneous allegations

Ms. Juarez next alleges that Mr. Huerta was aggressive and violent towards her, asserting that their divorce was because of domestic violence. Doc. 84, Evid. Hr'g Tr. at 150:14–153:23. During Ms. Juarez's pregnancy, Mr. Huerta would allegedly take away her car, computer, and camera; she also claims he would hit her. *See id.* at 152:1–152:20. Ms. Juarez then recounts her side of the altercation they had that gave rise to the October 2019 Protective Order, which, as the Court noted, is disputed. *See supra* Section III.B.2.a. But, as discussed, abuse against a spouse does not automatically establish a grave risk of harm to the child. *See Nunez-Escudero*, 58 F.3d at 377. And Ms. Juarez presented no evidence that the alleged acts of violence against her create a high risk that "the child will face immediate and substantial risk of an intolerable situation if [s]he is returned to Mexico." *Id.*

Ms. Juarez also mentions what she describes as "strange behavior." Doc. 84, Evid. Hr'g Tr. at 153:2. She describes an incident in which Ms. Juarez "had taken [the child] out of the bath and moved her to the bed to change her" when "[Mr. Huerta] came out of the shower in a towel and said, '[h]ow big do you think my penis is relative to [the child]?'" *Id.* at 152:11–152:14. Ms. Juarez also described "comments like, 'I'm afraid I'd like [the child] better than you.'" *Id.* at 152:15–152:17. The record is unclear regarding when these incidents occurred, though the child's needing to be changed suggests that many years have passed since they happened. And, beyond the allegations discussed above, Ms. Juarez presented no evidence of abuse against the child. Whatever Ms. Juarez may try to intimate regarding these incidents, such isolated

examples also do not establish that "the child will face immediate and substantial risk of an intolerable situation if [s]he is returned to Mexico." *Nunez-Escudero*, 58 F.3d at 377.

Finally, Ms. Juarez discussed, at various instances, issues the child may face from moving out of the United States back to Mexico. *See, e.g.*, doc. 84, Evid. Hr'g Tr. at 143:7–143:17 (seeking to "establish the internal disruption that uprooting [the child] would cause" and claiming that "[t]o bring the minor child from her current healthy network . . . will directly exacerbate her existing psychological trauma"); *see also id.* at 160:10–164:5.  But this too is insufficient to establish a grave risk of harm, especially in light of no other convincing evidence of such risk.  *See Friedrich*, 78 F.3d at 1067–68 (finding that allegations of trauma and difficulty in moving out of the United States are insufficient to bar return when "nothing in the record [exists] to indicate that life in [the country of habitual residence] would result in any permanent harm or unhappiness"); *Blondin*, 238 F.3d at 164 (noting that while "the fact that a child is settled may form part of a broader analysis of whether repatriation will create a grave risk of harm," but "[t]he ordinary disruptions necessarily accompanying a move would not by themselves constitute such a risk").

Finally, to use the fact of the child's potential struggle in returning to Mexico to bar her return would credit Ms. Juarez for her wrongful removal, simply because Ms. Juarez managed to then create a positive environment for the child in the United States that the child would struggle to leave.  It also would incentivize Ms. Juarez and others to conceal their abduction as long as possible to exacerbate these would-be harms.  This incentive structure would directly contravene the Hague Convention and the Court would thereby have the discretion to order return, notwithstanding this defense.  *See Golan*, 596 U.S. at 676.

26

In sum, the Court found that Ms. Juarez failed to meet her burden to prove, by clear and convincing evidence, that the return of the child would create a grave risk of harm upon return. *See* doc. 87, Evid. Hr'g Tr. at 30:23–31:1; *see also Silverman*, 338 F.3d at 900; *Nunez-Escudero*, 58 F.3d at 377.  While Ms. Juarez complained during her testimony that she did not have enough time to gather all the evidence from Mexico, the Court finds that she ably represented herself, *see* doc. 87, Evid. Hr'g Tr. at 19:3–19:6, and notes that she did not move to continue the trial a second time.

## IV.    Conclusion

In sum, the Court finds that Ms. Juarez wrongfully removed the child from Mexico to the United States under the Hague Convention.  *See Dubikovskyy*, 54 F.4th at 1047; *Abbott*, 560 U.S. at 13 (citing Hague Convention art. 3(b)).  And she has not, through *any* of the evidence presented, met her burdens to establish that the child will face a grave risk of harm upon return to Mexico, nor has she established that the child is sufficiently mature for the Court to consider the child's views and ostensible objections to return.  *See* 22 U.S.C. § 9003(e)(1), (2); *Dubikovskyy*, 54 F.4th at 1047; *Silverman*, 338 F.3d at 900; *Nunez-Escudero*, 58 F.3d at 377.

Finally, notwithstanding the defenses, return also serves the purposes of the Hague Convention; even if Ms. Juarez had adduced some evidence to support the defenses, the Court nonetheless would have exercised its discretion to order the return of the child.  *See Golan*, 596 U.S. at 676; *Custodio*, 842 F.3d at 1091–92; *Legal Analysis of the Hague Convention*, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986).  As the Court said on the record, "[i]t would not only be disingenuous, but more importantly, contrary to the Hague Convention and ICARA to allow Ms. Juarez to profit from her own wrong" in "depriv[ing] Mr. Huerta of his ability to exercise his rights."   Doc. 87, Evid. Hr'g Tr. at 27:4–27:6.

27

The Court ends with what Ms. Juarez stated in her closing argument: "Under 22 U.S.C. 9001(b)(4) this Court's role is limited to determine[ing] rights under the Hague Convention.  It does not decide who is the better parent.  It does not decide where [the child] will be happier.  It does not decide the merits of the underlying custody dispute.  Those questions belong to the Mexican family court . . . ." *Id.* at 13:16–13:21.  The Court agrees wholeheartedly, as reflected in the Court's ordering the return of the child to Mexico.  *See* docs. 72, 73.

So ordered this 9th day of July 2026.

_____

STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE

28