UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CARLOS EMILIO HUERTA TERRAZA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:26-cv-00655-SRC |
| | ) | |
| SUSANA YOSIRA JUAREZ ZARATE, | ) | |
| | ) | |
| Respondent. | ) | |

## Memorandum and Order

Respondent Susana Yosira Juarez Zarate ("Juarez") illegally abducted her child to the United States and now seeks to avoid paying the price to bring the child home. As the Court stated when ordering the child's return, it will not allow Juarez to profit from her wrong. Doc. 87, Evid. Hr'g Tr. at 27:1–6. The Court therefore orders her to pay Petitioner Carlos Emilio Huerta Terraza's ("Huerta") expenses per his Motion for Costs and Fees. Doc. 88.

## I. Background

### A. Factual background

Granting this motion follows directly from the merits of the underlying dispute. Huerta and Juarez are Mexican citizens who married, had a child, divorced, and signed a parenting agreement ordered by a Mexican family court providing them shared legal and physical custody over the child, along with other rights and obligations. Doc. 90 at 2 (The Court cites to page numbers as assigned by CM/ECF.). It also prohibited travel with the child outside Corregidora, Querétaro, Mexico without a shared itinerary and court authorization, specifically noting the problem of illegal retention and child abduction. *Id.*

After Huerta suffered brain damage from a car accident, Juarez asked the family court to conduct a mental evaluation of Huerta and strip his custody rights. *Id.* The family court set a hearing to determine the best structure for him to exercise his physical custody rights and gave Juarez temporary physical custody of the child pending the hearing. *Id.* Juarez then skipped the hearing and brought the child to the United States, telling her that it was only for a vacation, and remained there for almost a year. *Id.* at 3.

**B. Procedural background**

Huerta filed a verified petition under the Hague Convention to return the child to Mexico. Doc. 12; doc. 2-1; *see* Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11, 670, 1343 U.N.T.S. 49; 22 U.S.C. §§ 9001–9011. After hearing all testimony and evidence from both parties, the Court granted Huerta's petition, made its findings on the record, and ordered the return of the child to Mexico. *See* docs. 71–73. The Court's detailed oral and written findings established the propriety of the award here: Juarez wrongfully removed the child from Mexico to the United States under the Hague Convention and International Child Abduction Remedies Act, and she failed to meet her burden to establish either defense she asserted. *See* doc. 90; doc. 87, Evid. Hr'g Tr.

The Court found that Huerta met his prima facie case that Juarez violated the Hague Convention. Doc. 90 at 6–9; *see Dubikovskyy v. Goun*, 54 F.4th 1042, 1047 (8th Cir. 2022). Juarez argued that the family-court order stripped Huerta's custody rights, but the Court disagreed. Doc. 90 at 7–8. It found that Huerta retained custody rights, including the right to have the child remain in Mexico. *Id.* at 8. The family-court order suspended Huerta's visitation rights only temporarily, and did not suspend his custody rights—as even Juarez's Mexican attorney testified. *Id.*; doc. 87, Evid. Hr'g Tr. at 24:18–25:3. And Huerta continued to exercise

his custody rights even after the child's removal, including buying school supplies, trying to find out where she was, attempting to call her on her birthday, and showing up to court hearings about her. Doc. 90 at 9.

The Court also found Juarez failed to meet her burden to establish any defense to bar the child's return. *Id.* at 11. First, she raised the mature-child defense, which allows courts to "refuse to order the return of the child if . . . the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [the child's] views." *Id.*; Hague Convention art. 13. The Court conducted a lengthy *in camera* interview of the child and found that the child's position on staying in the United States was the product of Juarez's undue influence, not that of a mature child. Doc. 90 at 14. So the Court found that Juarez failed to meet her burden as to this defense. *Id.*

Second, and more relevant here, she presented a grave-risk-of-harm defense. *Id.* at 15. This defense allows courts to refuse returning the child if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b). Even when a respondent meets this burden, a court retains discretion to order the return of the child notwithstanding the defense. *See Golan v. Saada*, 596 U.S. 666, 676 (2022). The Court found Juarez failed to meet her burden to prove this defense as well. Doc. 90 at 27. Because Juarez inexplicably raises this failed defense again in opposition to the Motion for Costs and Fees, doc. 99 at 9, the Court discusses its findings in more detail below.

The Court ultimately found that Juarez wrongfully brought the child to the United States and ordered the child's return to Mexico. Doc. 90 at 27–28. The Court further found that far from seeking Huerta's consent to bring the child to the United States as required by the parenting

agreement, she engaged in manipulation and deceit in doing so. Doc. 87, Evid. Hr'g Tr. at 25:9–17.

Juarez, supposedly relying on the thin reed of a family-court order temporarily suspending Huerta's visitation rights, defied that same order, which she herself had sought; failed to appear at the hearing that the family court scheduled, even after it warned of sanctions for nonappearance; deprived the family court of the opportunity to determine her own petition; took the law into her own hands; violated Mexican law and court orders; lied to her child by telling her they were going to the United States for only "a vacation"; abducted her child under the Hague Convention and ICARA; illegally removed her child from Mexico and brought her to the United States; and brought about all the proceedings before the Court and the expenses incurred in litigating them. *Id.* at 25:12–25; 26:1–11; 32:11–16; 37:20–25. With this in mind, the Court considers and grants Huerta's Motion for Costs and Fees, doc. 88, per the Hague Convention and ICARA.

## II. Standard

The same statutes allowing Huerta to return the child home permit the Court to order Juarez to reimburse him for doing so. Article 26 of the Hague Convention on the Civil Aspects of International Child Abduction states that "[u]pon ordering the return of a child . . . the judicial or administrative authorities may, where appropriate, direct the person who removed or retained the child . . . to pay necessary expenses incurred by or on behalf of the applicant, including travel expenses, any costs incurred or payments made for locating the child, the costs of legal representation of the applicant, and those of returning the child." Hague Convention art. 26. Congress passed ICARA to effectuate the Hague Convention. *See* 22 U.S.C. § 9001(b)(1).

Courts must order payment of expenses unless it's "clearly inappropriate." 22 U.S.C. § 9007(b)(3) ("Any court ordering the return of a child . . . shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate."); *Rydder v. Rydder*, 49 F.3d 369, 373 (8th Cir. 1995) ("ICARA requires any court ordering the return of a child under the Hague Convention to award fees and costs to the successful party unless such order would be 'clearly inappropriate.'" (citation omitted)).

The statute makes presumptively reimbursable expenses for transcription, lodging, travel, counsel's lodging, counsel's travel, fact and expert witnesses, investigations to find the child, shipping, and filing. *See Souratgar v. Lee Jen Fair*, 818 F.3d 72, 78 (2d Cir. 2016); *Cuellar v. Joyce*, 603 F.3d 1142, 1143–44 (9th Cir. 2010). A respondent's "straitened financial circumstances," however, may render "an award of fees and legal costs . . . so excessive as to constitute an abuse of discretion." *Rydder*, 49 F.3d at 373–74.

## III. Discussion

Huerta seeks $40,822.21 in expenses incurred in litigating these proceedings. Doc. 88 at 9. Of that amount, Juarez expressly challenges $36,686.66. Doc. 99. The Court addresses them separately, granting both.

### A. The $36,686.66 challenged expenses were necessary.

Juarez challenges $36,686.66 of the expenses that Huerta seeks: $8,720.52 for Mexican legal representation; $14,392.34 for interpretation; $4,331.19 for translation; $4,170.45 for transportation; $1,937.04 for lodging; $360.60 for counsel's transportation; $2,609.52 for counsel's lodging; and $165 for counsel's parking. Doc. 88 at 2–3, 9; doc. 99 at 6–8. Huerta

doesn't seek attorneys' fees for his American counsel because they represent him pro bono. *Id.*; doc. 101 at 9.

First, the Court awards $8,720.52 for the Mexican legal representation. Huerta incurred this expense in retaining Mina Mestre as counsel in Mexico to assist with his case and locate the child with a private investigator. Doc. 88 at 6. Juarez contends "much of [Mestre's work] involved issues litigated in, and continuing to be litigated in, the Mexican family courts. [Mestre] did not appear as a witness nor as co-counsel." Doc. 99 at 6. But as Huerta correctly replied, ICARA doesn't limit legal expenses to testimony or court appearances. Doc. 101 at 4; *see* 22 U.S.C. § 9007(b)(3).

According to Huerta, Mestre's work included "necessary actions before the Family Court in Querétaro to obtain additional evidence needed for the proceeding in the United States . . . requesting an Interpol search, and requesting precautionary measures such as the prohibition on the child leaving national territory and notices to airlines and immigration authorities." Doc. 101 at 3. He also states she "provided essential support to my legal team in the United States, including support in the selection of counsel, support with the legal strategy in the United States, assistance in resolving legal and evidentiary questions, and support in the preparation of interrogatories and witnesses." *Id.* Mestre's filed invoice states it is a "proposal" and doesn't include an itemized hourly bill. Doc. 88-2 at 10–14. But the document is dated June 16, 2026, it states that $8,720.52 in expenses were "charged to date for the services described herein," it lists activities matching Huerta's statements, and all the activities appear to have been necessary to establish his petition. Doc. 88-2 at 10–14. Because the statute squarely covers legal expenses, the Court awards them here.

Second, the Court awards $14,392.34 for interpretation expenses. Huerta claims he incurred these for a court interpreter, including added rebooking expenses after Juarez requested continuance of a hearing. Doc. 88-1 at 4, 18–24. The Court ordered Juarez to deposit $3,500 to the Court for these expenses, doc. 34, Evid. Hr'g Tr. at 34:4–8, and Juarez responds that it would be inequitable to require her to pay more given her "lack of income and financial resources." Doc. 99 at 8. But as the Court stated during the hearing, the deposit would be only held, not used, "until [the Court] make[s] a determination as to who pays the expenses in this case." Doc. 34, Evid. Hr'g Tr. at 34:6–8. Juarez also deposited those funds into the registry of the Court, so Huerta's expenses remain unreimbursed. Because the interpretation was necessary for the proceedings, Juarez is responsible for it. 22 U.S.C. § 9007(b)(3). But the Court orders the Clerk of Court to transfer the $3,500 deposit to Huerta and reduces the award to Huerta accordingly so that Juarez isn't liable twice for the same expense.

Third, the Court awards $4,331.19 for translation. Huerta claims these expenses for engaging translators for Spanish documents necessary for his case and for expedited translation. Doc. 88 at 3; doc. 88-2 at 2. Juarez objects that "at the evidentiary hearing, counsel stated that her firm translated documents submitted to the Court and the person doing so worked for the law firm and used computer-assisted programs." Doc 99 at 6. But as Huerta points out, his counsel used in-house translations and expert translations at different points. Doc. 101 at 3–4. The translation expenses were necessary for the petition proceedings, so the Court awards them.

Fourth, the Court awards $4,170.45 for transportation and $1,937.04 for lodging. Huerta claims these expenses for his and his mother's travel to and from Mexico for the hearings. Doc. 88 at 6. The transportation also included flying back to Mexico with the child. *Id.* Juarez argues that Huerta's mother's transportation and lodging are not reimbursable because she did not

actually testify at trial. Doc. 99 at 7. But as Huerta argues, his mother attended the hearing to testify, so he paid the expenses for her as a fact witness. Doc. 101 at 5; doc. 84, Evid. Hr'g Tr. at 6:21–23. Juarez gestures toward, but does not directly cite, several cases for the proposition that the lodging is not compensable. Doc. 99 at 7. But because Huerta and his mother needed lodging to attend the proceedings to return the child home, these constitute necessary expenses. *See Cuellar*, 603 F.3d at 1143–44.

Fifth, the Court awards $360.60 for counsel's transportation; $2,609.52 for counsel's lodging; and $165 for counsel's parking. Juarez argues that representation by three pro bono attorneys was excessive, doc. 99 at 6–7, and so their transportation and lodging should not be compensable. The Court construes Juarez as disputing counsel's parking expenses for the same reasons. *Id.* Three attorneys aren't excessive or unusual for a pro bono case like this, especially from "large law firms who have dedicated pro bono practice divisions," a description that Juarez for some reason argues cuts against reimbursement. Doc. 99 at 7.

Juarez impugns the pro bono counsel's representation as if their gratuitous work raised her fees. *Id.* If anything, Juarez should be thankful that counsel represented Huerta pro bono. Given the likely hundreds of hours that Huerta's counsel put into this case due to the complexity of these proceedings, the facts at issue, the hearings conducted, the briefing submitted, and the travel and lodging, Juarez was likely spared tens of thousands of dollars in compensable attorneys' fees. "[T]he fact that [a petitioner's] lawyers provided their services pro bono does not make a fee award inappropriate. . . . Withholding fees from pro bono counsel would . . . discourage pro bono representation and undermine the Convention's policy of effective and speedy return of abducted children." *Cuellar*, 603 F.3d at 1143. The Court finds these expenses necessary and reimbursable.

**B. The $4,135.55 unchallenged expenses were necessary.**

Juarez does not expressly challenge $4,135.55 of expenses that Huerta seeks: $405 for court filing; $175 for service of process; $167.33 for couriers; $106.77 in FedEx expenses; $2,559.45 for transcription; and $722 in children's clothing and personal items. *See* doc. 88 at 2–3, 9; doc. 99. Huerta incurred them in the proceedings and in returning the child to Mexico. The Court therefore grants the $4,135.55 in unchallenged expenses.

**C. The award is not clearly inappropriate.**

Juarez argues that making her pay the above challenged expenses would be "clearly inappropriate" under ICARA for three reasons. Doc. 99 at 9. Two directly dispute the Court's prior findings, and one is conclusory. Juarez once again argues that she took her child to the United States due to good faith and a grave risk of harm, inexplicably ignoring the Court's prior findings that these defenses lacked support. Doc. 99 at 8. And she argues she can't pay the expenses without any evidence. *Id.* at 8.

She again argues that she acted under a "good faith belief that she had the legal right" to bring the child to the United States because "at the time she left Mexico, the Mexican family court had suspended all [Huerta's] physical custodial rights" and "[t]he record refutes any idea that [she] acted in bad faith or maliciously." *Id*. at 8. Yet the Court found that Juarez deliberately violated the parenting agreement, the family court order, Mexican law, and international law; manipulated and deceived her own child; and kept her child away from her father for almost a year. Doc. 87, Evid. Hr'g Tr. at 25:12–26:11; 32:11–16; 37:20–25. Her own Mexican attorney testified that the parenting agreement prohibited the child's travel out of Mexico and that the family-court order didn't suspend Huerta's joint legal custody rights. *Id.* at 24:25–25:8; doc. 90 at 8. Had Juarez chosen to consult her own attorney before absconding to

the United States, she would have learned that her lay, self-serving interpretation of the family court's order was flatly incorrect. Now that she faces the prospect of paying for the expenses for the litigation, she argues this Court was mistaken. Doc. 99 at 8. For the same reasons that the Court found earlier, the Court finds no good faith in Juarez's abducting the child.

Next she claims again that she had "a strong affirmative defense of grave risk of harm," doc. 99 at 9. Just like her good-faith argument, she ignores the Court's prior findings. She previously asserted multiple grounds for her defense that the child faced a grave risk of harm. Doc. 90 at 16. The Court examined her arguments in detail and found that she had not, "through *any* of the evidence presented, met her burdens to establish that the child will face a grave risk of harm upon return to Mexico." *Id.* at 27.

First, she raised a 2019 family-court protective order requiring Huerta to stay at least 100 meters away from her and the child. *Id.* at 17. The Court found that the order didn't contain any articulable factual findings about the events preceding its issuance, that it wasn't paired with a formal abuse charge, that it was issued almost six years ago, that the parties agreed in the parenting agreement to "withdraw and remove any other investigative files," and that the parties dispute the order's underlying facts. *Id.* So the Court didn't find this order supported a grave-risk-of-harm finding. *Id.* at 18. Second, she raised a 2024 investigation for violence by the Mexican child-welfare office initiated after Juarez herself reported Huerta's disciplinary techniques to the office. *Id.* The Court found the underlying facts didn't establish a grave risk of harm. *Id.* at 19. Third, she submitted the family-court order temporarily suspending Huerta's visitation rights. *Id.* The Court found the order didn't support a grave-risk finding because it didn't enable determining specific evidence of potential harm as required by the Hague Convention and it wasn't a final adjudication on the merits of Huerta's custody rights. *Id.* at 20.

Fourth, she presented various parenting decisions by Huerta as evidence of an alleged grave risk of harm. *Id.* at 21. The Court found none of these established the child would face a grave risk of harm. *Id.* at 24–25. Fifth, Juarez alleged Huerta was aggressive and violent towards her; described what she called "strange behavior"; and discussed issues the child would face from returning to Mexico. *Id.* at 25–26. The Court found that Juarez presented no evidence that the alleged incidents created a grave risk of harm to the child, and stated that it would not use the child's potential struggle in returning to Mexico to bar her return. *Id.* In any case, none of Juarez's attempts to reraise issues previously ruled on affect the appropriateness of the award.

Finally, she argues she lacks the financial resources to pay the award, yet she comes forward with no evidence of her financial condition. Doc. 99 at 8–9. Although she cites *Rydder* in support, doc. 99 at 4, the Eighth Circuit there reduced the award due to straitened financial circumstances, *Rydder*, 49 F.3d at 373–74. Juarez does not introduce any evidence supporting her financial difficulties. Doc. 99 at 8–9. She produces no affidavit, declaration, financial statement, or anything to support her financial condition. *Id.* She does submit a signed "verification" of the truth of her reply brief's contents, *id.* at 10, but the brief itself is devoid of factual detail of her financial condition. *Id.* at 7–9. She cites to nothing in the record, she cites no evidence for her lack of current employment or lack of substantial financial resources, and she only vaguely references Huerta's alleged failure to pay child support, but the Court found that he "generally honored his financial obligations under the Parenting Agreement." Doc. 90 at 8. And the facts that matter here involve Juarez's present financial state, not alleged historical incidents. The Eighth Circuit in *Rydder*, the only binding precedent on this issue, only reduced the award for financial difficulty when it had particular knowledge of the respondent's current assets and saw "no evidence in the record that [the respondent's] financial circumstances [had]

ameliorated." *Rydder*, 49 F.3d at 372–74; *Rydder v. Rydder*, 79 F.3d 1151, 1151 (8th Cir. 1996). Without evidence adequate to show that the Court should deviate from the statute's mandatory award of expenses, it will not reduce expenses for alleged financial difficulty.

## IV. Conclusion

Accordingly, the Court grants the [88] Motion for Costs and Fees and orders Juarez to pay $37,322.21 to Huerta no later than November 27, 2026. Huerta may inform the Court of the particulars of the payee (including name and address) and the account to which the Court should transfer the $3,500 deposit. Upon receipt of this information, the Court orders the transfer of Juarez's $3,500 deposit held in the registry of the court to Huerta.

So ordered this 5th day of November 2026.

STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE